**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **IN RE:** | **CASE NO. 14-08258** |
| **CASIANO COMMUNICATIONS INC**<br>**DIRECT RESPONSOURCE INC**<br><br>**Consolidated Debtors** | **Chapter 11** |
| | **FILED & ENTERED ON 9/25/2015** |

<u>**OPINION & ORDER**</u>

Before this court is Encanto Group LLC's ("Encanto") *Motion Submitting Itemization of Amounts Owed Pursuant to the Order Authorizing Post-Petition Financing From Encanto Dated November 12, 2014* [Dkt. No. 363], the *Objection* filed by Ferrer Faass & Co., LLC ("FFC") [Dkt. No. 377], the Debtors' *Opposition* [Dkt. No. 381], and Encanto's *Response* [Dkt. No. 394][1]. Encanto alleges it is owed a total of $1,304,285.03 from the loan, interest, legal fees and advisor fees.[2]

As follows, the court shall provide a brief summary of the pertinent events. The Debtors filed two voluntary petitions under chapter 11 on October 3, 2014. The cases were substantively consolidated by Order of the court on July 6, 2015. Encanto and the Debtors filed a joint motion ("the Joint Motion") on October 29, 2014 [Dkt. No. 34], setting forth the terms of the post-

---

[1] Encanto did not request leave from the court prior to the filing of this motion, nor did it restrict its motion to the required ten (10) page limit in violation of L.Cv.R. 7(c). That notwithstanding, the court took into consideration the substance of Encanto's response in the drafting of this opinion and order.

[2] Encanto submits a breakdown of this number and attaches exhibits to corroborate it. There appears to be a mathematical error in Encanto's motion as the amounts provided add up to $1,309,755.03, not $1,304,285.03. Regardless, this error has no effect on the courts determination of the fees to be allowed.

1

petition financing. On November 13, 2014, the court entered an Amended Order ("the Order") authorizing the Debtors to obtain post-petition financing from Encanto in the amount of $756,415.32, extended on a monthly basis and pursuant to the actual cash needs of the Debtors, to cover the cash shortfalls anticipated by the Debtors individually, for the months of October, November, December of 2014, and January 2015 [Dkt. No. 66]. At some point following the Order, the relationship between the Debtors and Encanto began to disintegrate, and on March 30, 2015, Encanto filed a motion alleging that the Debtors had breached the loan agreement and the Order [Dkt. No. 154]. Attached as an exhibit to Encanto's motion was an unexecuted copy of a Loan Agreement ("Agreement") dated November 12, 2014 [Dkt. No. 154]. This Agreement, which contained none of the exhibits described therein, set forth in detail terms allegedly agreed upon by these two parties with regards to the post-petition financing. Prior to this time, the court had not seen nor specifically authorized this Agreement. The court notes that although the Agreement has not been challenged by the Debtors, the court questions its materiality and enforceability *vis-a-vis* the terms of the Order.[3] Nevertheless, the court has made a prior legal determination utilizing the terms as set forth in the Agreement, in conjunction with the Order,[4] and will consider both the Order and the Agreement for adjudicating the matter of the fees. In their objection and opposition, FFC and the Debtors have zeroed in on the relevant factors the court needs to resolve, in order to determine the total amount owed to Encanto. Those factors are: the applicable interest rate and the interest rate to be charged in the event of default; did

---

[3] The amended Order contains terms, specifically in numbered paragraphs 10, 11 and 12 which affirm that the Order governs the legal relationship between the parties as to the post-petition financing.

[4] See the court's Opinion and Order filed on July 29, 2015 [Dkt. No. 272]. This Opinion adjudicated the issue regarding the 'right of first refusal' and its survivability once the loan was paid in full. It is important to note that there is no discrepancy between the Joint Motion and the Agreement as to the language used in describing the term 'right of first refusal.'

Debtors default and if so, on what date did such default occur; and Encanto's inclusion of indemnification claims, and costs and expenses of Encanto's counsel and advisors. The court will address each in turn.

### INTEREST RATE

The Joint Motion filed by Encanto and the Debtors states that the interest rate to be charged by Encanto for the Debtors' use of the approved post-petition loan is the annual rate of 10% over the WSJ Prime Rate, currently at 3.25%. The accrued interest and principal shall be payable on the maturity date and shall be calculated on the basis of a 360-day year, compounded monthly and based on the actual days elapsed. Likewise, subsection 2.6 of the Agreement contains the same definition of the interest rate. This rate is not in dispute.

The Joint Motion filed by Encanto and the Debtors states that the default interest rate shall be "equal to 1.5x the [i]nterest rate and shall automatically accrue on and after the occurrence of an [e]vent of [d]efault…." A straightforward calculation results in a default interest rate of 19.875%. The language in subsection 2.6 of the Agreement, states "following the occurrence of an [e]vent of [d]efault, the [i]nterest [r]ate shall *be increased* by 1.5x the [i]nterest [r]ate that would otherwise be applicable hereunder." (emphasis ours). This language in the Agreement could be interpreted to mean that the occurrence of an event of default could *increase* the 13.25% rate by 19.875%, thus creating a default interest rate of 33.125%. However, the court's Order, by its own terms, governs and incorporates all of the provisions between the Debtors and Encanto. The language setting forth the calculation of the default rate is not ambiguous and leaves no room for doubt that the interest rate to be charged the Debtors in the

event of a default is 19.875%.

Moreover, the allowance of a default interest of 33.125% is circumvented by U.S. Supreme Court and First Circuit case law. The court in In re Kalian, 178 B.R. 308 (Bankr.D.R.I.1995) stated that the question whether a secured creditor is entitled to post-petition interest is one of federal law. Vanston Bondholders Protective Committee v. Green, 329 U.S. 156 (1946); Debentureholders Protective Committee v. Continental Inv. Corp., 679 F.2d 264 (1st Cir.1982), *cert. denied sub nom.* Glen Corp. v. O.C. Associates, 459 U.S. 894 (1982). Section 506(b) of the Bankruptcy Code governs that right. Section 506(b) allows post-petition and reasonable fees, costs, and charges provided for under the loan agreement. 11 U.S.C. § 506; U.S. v. Ron Pair Enterprises, Inc., 489 U.S. 235 (1989).

Generally speaking, when it comes to determining the appropriate post-petition interest rate applied to consensual, over-secured claims, including those arising from agreements with default interest provisions, bankruptcy courts give deference to the parties' agreed interest term, but may modify the rate in appropriate circumstances. Vanston, 329 U.S. at 159 (denying payment of interest based on a balance of the equities). There are good reasons why a bankruptcy court should take a hard look at post-petition, pre-confirmation interest entitlements, particularly where, as here, they depart from the contract's base rate and particularly when the estate is insolvent. The relative distribution rights of creditors in bankruptcy are federal law concerns. They are affected, sometimes determined, by the amount of post-petition interest allowed to over-secured creditors. Id.

Though Section 506 allows for a default interest rate, it is not without limitation. The

allowance of interest and other charges in a bankruptcy proceeding involves a balancing of equities. See In re DeMaggio, 175 B.R. 144, 147–149 (Bankr.D.N.H.1994). Courts have the authority to deny default interest where "the higher rate would produce an inequitable result." Bradford v. Crozier, 958 F.2d 72, 75 (5th Cir.1992). This court gives deference to the foregoing authorities cited, and determines that the default interest rate is 19.875%. Allowing a default interest rate of 33.125% would result in a substantial detriment to Debtors, and an unreasonable windfall to Encanto.

## DID DEBTORS DEFAULT AND IF SO, WHEN?

The Joint Motion filed by Encanto and the Debtors [Dkt. No. 34, page 4] defines an event of default and provides:

**Events of Default:** Shall include:
(a) The Borrowers fail to pay any of the obligations under the DIP Financing on the dates when due; or

(b) Any representation, warranty or other written statement to the Post-Petition Lender, by either of the Debtors or any authorized representative on behalf of the Debtors, that proves to have been false when made; or

(c) The Borrowers fail to use the funds advanced through the Loans for the payments specifically contemplated in the Cash Flow Projections; or

(d) The occurrence of any event in the bankruptcy cases that has or could reasonably be expected to have a material adverse effect on (i) either of the Borrowers' condition (financial or otherwise), businesses, operations, prospects, or property, including, without limitation, if either Casiano or DRS expend or seek to expend more monies than were contemplated in the Four (4) Month Cash Flow Projections; or

(e) Either of the Borrowers or any other person files any motion seeking approval of any financing from any source other than the Post-Petition Lender; or
(f) Failure of the bankruptcy court to approve the contemplated sale motion pursuant to Section 363 of the Bankruptcy Code; or

(g) The Debtors' bankruptcy cases are converted to Chapter 7 prior to approval of a sale motion adjudicating the assets or property of both Debtors, whether real, personal, intellectual, intangible, or otherwise, to the Post-Petition Lender.

5

Through dozens of motions dating back to March 2015, the Debtors and Encanto have asserted their respective positions as to the apparent breakdown in negotiations regarding the sale of Debtors' assets. Encanto has lobbed numerous allegations of default against Debtors, who in turn have denied incurring in any breach. As the court sifts through this myriad of documents, two elements are crucial. Those are, did the Debtors breach the Order, and if so, on what date?

The first motion filed by Encanto on March 30, 2015 [Dkt. No. 154], which states that the Debtors are in default with regards to the Agreement, refers specifically to two events: (1) the Debtors' status report filed on December 2, 2014 [Dkt. No. 89], which contains information about other potential purchasers of the assets, and; (2) the Debtors' informative motion filed on March 19, 2015 [Dkt. No. 138], where the Debtors state that "[a]t least three other groups expressed an interest in acquiring the two businesses, but the Debtors' hands have been tied by the Loan Agreement, which prohibits the Debtors from negotiating with any party other than Encanto." Of this last event, Encanto claims that it "is a clear and indisputable admission that the Debtors breached the contract, which is an event of default pursuant to the Loan Agreement…."

In additional motions filed by Encanto, they refer to the status report filed by Debtors as the point in which the breach occurred, although the exact date is never specified in any of Encanto's motions. Regardless, as stated above, the legal docket of the case provides the date to be December 2, 2014 [Dkt. No. 89]. The court determines that this disclosure of potential purchasers of Debtors' assets does not rise to the level of default as defined in the Agreement, the Joint Motion, or more importantly the Order, which indeed is what governs the terms of the post-petition financing. In fact, what the Debtors disclosed in December 2014 and again on

March 19, 2015, is that third-parties expressed interest in acquiring/purchasing the assets of one or both corporations. This same information is provided in the Joint Motion itself. [5] From the record of events in the case, none of the expressed interest ever translated into a "bona fide offer."

However, the Debtors' filing of the disclosure statement and plan on June 16, 2015 [Dkt. No.'s 207 & 208], with the offer of purchase from FFC, appears to give rise to an event of default by the Debtors.[6] In the disclosure statement, Debtors' state that "[t]he Plan contemplates a Private Sale of all of the Debtors' assets to FFC, pursuant to a non-negotiated Letter of Intent ("LOI"), which is subject to certain due diligence." This statement, and the letter of intent from FFC dated June 16, 2015 [Dkt. No. 212] provide irrefutable evidence that the Debtors had received a "bona fide offer." As such, the court determines that on June 16, 2015, Debtors committed a breach of the post-petition financing as set forth in the Order, thus triggering the default rate of 19.875%.

## INDEMNIFICATION CLAIMS, COSTS AND EXPENSES

The Joint Motion filed by Debtors and Encanto states in relevant part:

**Loan Amount: …** The aggregate amount advanced by Post-Petition Lender, together with unpaid interest thereon and any other amounts owing by the Debtors to the Post-Petition Lender, including, without limitation, any and all indemnification claims and any costs and expenses of Post-Petition Lender's counsel and advisors in connection therewith (estimated at between $35,000.00 and $40,000.00), shall be hereinafter referred to as the "Loan Amount." unrefutable

---

[5] "It should be noted that other companies and groups have expressed an interest in acquiring the Debtors' assets…." See Dkt. No. 34, page 8.

[6] The Debtors' default would fall under subparagraph "(e) Either of the Borrowers or any other person files any motion seeking approval of any financing from any source other than the Post-Petition Lender." The court uses the term "appears" because no evidence has been provided by either Debtors or Encanto as to whether Debtors informed Encanto of this "bona fide offer."

See Dkt. No. 34, page 3. The Agreement in article 6.4 contains a very detailed description of the Debtors' indemnification obligations towards Encanto as to costs, expenses and taxes. Although the language of the Joint Motion is sparse as to this specific point, it does not exclude Encanto's contention that in addition to the payment of costs and professional fees in connection with the execution of the Agreement, the Debtors likewise agreed to pay Encanto any and all fees related with the enforcement and protection of the Agreement. Nonetheless, the language of the Joint Motion does set an estimate of $35,000 to $40,000 on said indemnification.[7] In sum, the court agrees with Encanto that the Joint Motion and Order include cost and expenses for the negotiation as well as the enforcement of the loan Agreement.

The question before the court is not the reasonableness of the attorney's fees invoiced to Encanto by Garcia-Arregui & Fullana Law Offices and Pavia & Lazaro, PSC, and of advisor, Puerto Rico Economic Development Company, LLC ("Predco") *per se*. The issue is rather their chargeability to the Debtors. As stated in the Joint Motion, Encanto estimated that the total of all the indemnification claims and the costs and expenses of Encanto's attorneys and advisors would not exceed $40,000. The charges submitted by Encanto total $323,458.84.

Many entries in the three billing reports provided are identified as relating to matters not

---

[7] Article 6.4 of the Agreement begins with the following language:

> "Upon demand by the Post-Petition Lender, the Borrowers agree to pay all reasonable out of pocket costs and expenses of the Post-Petition Lender in connection with the negotiation, preparation, execution, delivery, administration, modification, amendment or waiver of this Agreement and the other Loan Documents; *provided* that the fees and expenses of Post-Petition Lender's counsel and advisors expenses are estimated to be between $35,000-$40,000." (Emphasis ours)

The court considers that the use of the word "provided" in that sentence of the Agreement works to limit the fees and expenses to no more than $40,000. However, the word "provided" is not contained in the Joint Motion nor the Order, which the court deems to govern the post-petition financing.

specifically pertaining to the post- petition financing (*i.e.*, an asset purchase agreement, Section 363 sale, negotiations with EDB, Hacienda and IRS, disclosure statement and plan, objections to the substantive consolidation, bidding for the Debtors' assets, etc.). These entries have nothing to do with the post-petition loan. Rather they relate to Encanto's legal representation before the court and their pursuit of acquiring Debtors' assets. In addition, many of the individual itemized entries in Predco's Invoice [Exhibit D, Dkt. No. 363] are not capable of line-by-line review to determine relevance to the post-petition financing, as most of the entries describe meetings, emails, phone conferences, etc., on a number of issues unrelated to the post-petition financing. Similarly, the invoices provide by Garcia- Arregui & Fullana have billing entries that are too generalized in their description to afford the court the ability to link it to the post-petition financing. The court has made every effort to review each and every invoice to determine its applicability to "any and all indemnification claims and any costs and expenses of Post-Petition Lender's counsel and advisors in connection therewith" as agreed to by the Debtors' and Encanto.

The court concurs with Debtors' argument that by making the post-petition loan to the Debtors, Encanto did not become entitled to charge all of its activities and attorneys' fees to the Debtors. Generally, a party bears its own fees, except where a statute or contract allows for the assessment of those fees against another. The Order in this case does not allow for fees unrelated to the post-petition financing, nor are they otherwise allowable as charges to the Debtors. Likewise, the right to recover attorney and advisor fees under Section 506(b) of the Code is limited by their reasonability. See In re 1095 Commonwealth Corporation, 263 B.R. 530 (Bankr.Mass. 1999). The first entry in Predco's invoice is dated May 8, 2014, that is almost five

months prior to the filing of the Debtors' bankruptcy petitions. The first entry containing the title of the Joint Motion is dated October 23, 2014. For the reasons discussed *supra* regarding the limitations imposed on the courts by Section 506 of the Code, all of the pre-petition charges billed to Encanto by the advisor(s) from the Puerto Rico Economic Development Company, LLC are disallowed in their entirety. The court will consider the advisory work performed by Predco starting from the petition date.

The court has reviewed the exhibits containing the billing reports submitted by Encanto and allows the following amounts for all indemnification claims, and costs and expenses of Encanto's counsel and advisors:

**Counsel Fees**:

| | |
|---|---|
| Mr. Gerardo Pavia | $1,162.50[8] |
| **Garcia-Arregui & Fullana** | $21,876.00 |

**Advisor Fees**:

| | |
|---|---|
| Puerto Rico Economic Development Company, LLC | $34,661.25 |

For a total amount of $57,699.75.

**CONCLUSION**

For the reasons set forth above, Encanto shall file with the court by September 30, 2015, a <u>legible</u> calculation of the interest owed on the loan amount from the date of disbursement until September 30, 2015. This calculation shall use the interest rate of 13.25% from disbursement of the monies loaned until June 16, 2015. Thereafter, from June 17, 2015 until September 30, 2015,

---

[8] The bill provided to the court in Encanto's motion had an "Attachment C" which was a copy of an invoice dated 09/01/2015 from the law offices of Pavia & Lazaro. The total balance due was for $5,470.00. However, the itemized dated portion of the invoice totaled only $1,872.50. Of that total, $710 was disallowed due to the fact that it was not related to the post-petition financing.

the calculation of the interest shall be at the default rate of 19.875%. The total amount allowed by the court to Encanto in full payment of the Debtors' obligations as to the indemnification claims, and costs and expenses of Encanto's counsel and advisors in relation to the post-petition financing is $57,699.75.

SO ORDERED

San Juan, Puerto Rico, this 25th day of September, 2015.

Brian K. Tester
U.S. Bankruptcy Judge